UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JGB (CAYMAN) NEWTON, LTD., <br><br>                              Plaintiff, <br>    -against- <br><br> SELLAS LIFE SCIENCES GROUP, INC.; <br> DR. ANGELOS M. STERGIOU, MD, ScD H.C.; <br> ALEKSEY N. KRYLOV; JANE WASMAN; STEPHEN <br> F. GHIGLIERI; DR. DAVID A. SCHEINBERG, MD, <br> PhD; ROBERT L. VAN NOSTRAND; and JOHN <br> VARIAN, <br><br>                          Defendants. | 18 Civ. 03095 (DLC) (KHP) <br><br> **AMENDED COMPLAINT** |

Plaintiff JGB (Cayman) Newton, Ltd. ("JGB"), by and through its attorneys, Latham & Watkins LLP, for its amended complaint against Defendants Sellas Life Sciences Group, Inc. ("SLS" or the "Company"), Dr. Angelos M. Stergiou, MD, ScD h.c. ("Stergiou"), Aleksey N. Krylov ("Krylov"), Jane Wasman ("Wasman"), Stephen F. Ghiglieri ("Ghiglieri"), Dr. David A Scheinberg, MD, PhD ("Scheinberg"), Robert L. Van Nostrand ("Van Nostrand"), and John Varian ("Varian") (collectively, the "Individual Defendants," and with SLS, "Defendants"), hereby alleges the following:

## NATURE OF THE ACTION

1.     This is an action for breach of contract and fraud.  Plaintiff JGB is an investor in Defendant SLS through a convertible debenture agreement into which JGB first entered with SLS's predecessor company, Galena Biopharma, Inc. ("Galena"), in May 2016. Pursuant to the parties' Securities Purchase Agreement dated May 10, 2016, as amended and restated on August 22, 2016 (the "August 2016 Agreement"), and as further amended and subject

to certain waivers and consents as of December 14, 2016, May 1, 2017, July 10, 2017, and August 7, 2017 (collectively, the "Debenture Agreements"), Defendant SLS has a binding contractual obligation to deliver shares of its common stock to JGB. JGB has performed all of its obligations under the Debenture Agreements and has properly demanded that SLS deliver shares. On and after April 2, 2018, SLS refused and failed to deliver certain shares in breach of its obligations under the Debenture Agreements, depriving JGB of the value to which those shares entitled it. When SLS subsequently delivered shares to JGB, SLS repudiated the contractually determined formula for future redemptions, and SLS has maintained its repudiation of the terms of the Debenture Agreements to this day.

2.        In addition to these straightforward contractual breaches, Defendant SLS – directed and aided by the Individual Defendants – engaged in a pernicious scheme to defraud Plaintiff JGB and to deprive JGB of its rights under the Debenture Agreements. Beginning in February 2018, Defendants, knowing that SLS would soon announce major news about a clinical drug trial, made a series of misleading and pretextual offers to buy out JGB's right to delivery of shares under the Debenture Agreements. Concealing the major positive news that would soon cause SLS's stock price to soar, Defendants misrepresented their offers as an opportunity for JGB to cash out at a "premium" to the stock's value at the time – a premium that Defendants knew would soon be dwarfed by the stock's reaction to the Company's imminent announcement. During this period, Defendants induced JGB to refrain from trading for several days in March 2018 by imparting material nonpublic information about potential financing arrangements, information which was much less significant for the Company than the positive clinical results that Defendants would soon announce but hid from JGB.

2

3.      On the morning of April 2, 2018, after JGB declined for a final time to accept Defendants' latest offer to buy out its rights under the Debenture Agreements, Defendants informed JGB that SLS would no longer honor JGB's redemption notices using the share calculation formula set forth in the Debenture Agreements, which SLS had fulfilled several times in prior months.  Attempting to alter the share calculation formula unilaterally, Defendants informed JGB that they would only consider delivering a fraction of the shares that JGB had properly demanded, and that they refused to deliver any shares at all unless JGB acquiesced to their proposed new fractional approach.

4.      That same morning – just ten or so minutes after conveying their refusal to honor JGB's contractual right to delivery of shares – Defendants issued a press release announcing the positive clinical results that they had systematically concealed from JGB.  That day, the value of SLS stock increased more than 100%, with trading volume over the next two days that was approximately 337 times the shares' average volume.

5.      During those two days and in the days that followed, Defendants refused to deliver shares to which JGB was entitled under the Debenture Agreements, fulfilling their bad-faith scheme to deprive JGB of – and retain for themselves – the benefit of the news that Defendants knew would dramatically increase the stock's value.  Defendants also thus denied JGB the benefit of shares it could have purchased in the market during the prior period when Defendants had fraudulently induced JGB to refrain from trading in the Company's stock.

6.      Accordingly, JGB now seeks specific performance of SLS's obligation to deliver shares pursuant to the Debenture Agreements, a declaratory judgment that the share calculation formula shall continue to be governed by the clear terms of the Debenture

Agreements, and damages arising from SLS's prior refusal to deliver shares under the Debenture Agreements. Those damages take the form of the gains JGB would have realized from the sale of the shares it was due from SLS had SLS timely honored its obligations to deliver the shares to which JGB was entitled. In addition, JGB seeks damages against all of the Defendants arising from their other violations and fraudulent acts. JGB seeks injunctive relief and damages to enforce the rights of which it has been deprived by Defendants' outrageous conduct.

## PARTIES

7.      JGB is an investment fund that engages, among other transactions, in investments that provide public companies with capital through both debt and equity investments. JGB is organized under the laws of the Cayman Islands and has its principal place of business in George Town, Grand Cayman, Cayman Islands. For purposes of diversity under 28 U.S.C. § 1332(a), JGB is a citizen of the Cayman Islands, a foreign state.

8.      Defendant SLS is a corporation organized under the laws of Delaware with its principal place of business in New York County, New York. For purposes of diversity under 28 U.S.C. § 1332(a), SLS is a citizen of Delaware and New York. Defendant SLS assumed all obligations of Galena under the Debenture Agreements when SLS merged with Galena on or about December 29, 2017.

9.      In April 2017, SLS's predecessor company, Galena, entered into a settlement with the SEC for participating in a fraudulent stock promotion scheme. Among other sanctions, the settlement order required the Company to cease and desist from violating federal securities laws in the future.

4

10.     Defendant Stergiou is the President and Chief Executive Officer of Defendant SLS, as well as Vice Chairman of SLS's Board of Directors, and served in that role at the time of the events described herein. Upon information and belief, he is a citizen and resident of New York.

11.     Defendant Krylov is the former Interim Chief Financial Officer of Defendant SLS and served in that role at the time of the events described herein. Upon information and belief, he is a citizen and resident of New Jersey.

12.     Defendant Wasman is a member of the Board of Directors of Defendant SLS and served in that role at the time of the events described herein. Upon information and belief, she is a citizen and resident of New York.

13.     Defendant Ghiglieri is a member of the Board of Directors of Defendant SLS and served in that role at the time of the events described herein. Upon information and belief, he is a citizen and resident of California.

14.     Defendant Scheinberg is a member of the Board of Directors of Defendant SLS and served in that role at the time of the events described herein. Upon information and belief, he is a citizen and resident of New York.

15.     Defendant Van Nostrand is a member of the Board of Directors of Defendant SLS and served in that role at the time of the events described herein. Upon information and belief, he is a citizen and resident of New York.

16.     Defendant Varian is a member of the Board of Directors of Defendant SLS and served in that role at the time of the events described herein.  Upon information and belief, he is a citizen and resident of California.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because the action is brought by a citizen of a foreign state against citizens of states within the United States, and the matter in controversy exceeds the sum or value of $75,000 exclusive of costs and interest.

18.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because certain of the claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  This Court also has supplemental jurisdiction over JGB's state law claims, 21 U.S.C. § 1367(a).

19.     Venue is proper in this district pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(c)(2), in that Defendants are subject to this Court's personal jurisdiction because Defendant SLS resides in this district, with its principal place of business in New York County, New York.  Defendants Stergiou and Krylov (the "Officer Defendants"), and Defendants Wasman, Ghiglieri, Scheinberg, Van Nostrand, and Varian (the "Director Defendants") each work in and/or committed and caused the tortious acts described herein at Defendant SLS's principal place of business, located in this district.

20.     Furthermore, Defendant SLS has agreed that this Court is a proper venue for legal proceedings concerning the interpretation, enforcement, and defense of transactions contemplated under the Debenture Agreements, and it has waived all defenses based on personal jurisdiction or venue in this district. *See* Exhibit 1, § 8(d).

## GENERAL ALLEGATIONS

### A.     Debenture Agreements and Past Performance

21.     The Debenture Agreements provide a common convertible note arrangement through which JGB loaned money to SLS in return for debt repayments and rights to redeem outstanding debt amounts for shares of the Company's stock under prescribed terms.

22.     In 2016, JGB paid $24,000,000 to Defendant SLS in consideration for the rights provided by the Debenture Agreements.

23.     Under the terms of the Debenture Agreements, Defendant SLS, as successor to Galena, has agreed to the following key provisions:

    a.  Pursuant to the August 2016 Agreement and an amendment dated
        August 7, 2017, JGB is permitted to submit an unlimited number
        of notices to redeem for shares ("Holder Redemption Notices")
        during a calendar month. *See* Exhibit 3, § 3(b).

    b.  When delivering shares in satisfaction of a Holder Redemption
        Notice, Defendant SLS must deliver to JGB or its designee a
        number of shares determined by a prescribed formula, equal to the
        quotient of (x) the applicable Holder Redemption Amount and (y)

7

a contractually defined "Stock Payment Price." The Stock
Payment Price is the lower of (a) eighty percent (80%) of the
volume-weighted average price ("VWAP") for the trading day
immediately prior to the applicable date (the "Prior Day VWAP")
and (b) eighty percent (80%) of the average of the three (3) lowest
VWAPs during the twenty (20) consecutive trading day period
immediately preceding the applicable date (the "Twenty Day
VWAP"). *See* Exhibit 4 § 3; Exhibit 1, § 4(a)(i), (v).

c.  Under certain conditions related to the market price and liquidity
of the shares and SLS's market capitalization, collectively known
as "Equity Conditions," SLS shall honor the Holder Redemption
Amounts in cash or, with JGB's consent, by delivering aggregate
consideration in shares and cash in satisfaction of the applicable
Holder Redemption Amount. During the relevant period, the
Debenture was in "Stock On" mode, meaning that the Company
was required to honor Holder Redemption Amounts in shares of
SLS stock, in an amount determined by dividing the Holder
Redemption Amount by the Stock Payment Price. If (and only if)
the Stock Payment Price was below $0.35 per share ("Stock
Payment Price Floor"), the Company shall deliver both cash and
shares, according to the following formula: (i) the number of
shares equal to the quotient obtained by dividing such Holder
Redemption Amount and $0.35, and (ii) cash equal to the

difference between the Holder Redemption Amount and the aggregate deemed value of the shares delivered in clause (i). *See* Exhibit 2, § 3.

d. If Defendant SLS fails for any reason to deliver required stock certificates to JGB pursuant to the Debenture Agreements by the second trading day following the applicable payment date, then Defendant SLS shall pay to JGB, in cash, as partial liquidated damages in addition to any other remedies, for each one thousand dollars ($1,000) of principal amount being redeemed, $5 per trading day for each trading day after the second trading day following such date, until such certificates are delivered or the redemption is rescinded; provided, however, that if Defendant SLS has failed to deliver certificates required to be issued under the Debenture Agreements more than twice in any twelve (12) month period, then such partial liquidated damages shall begin to accrue on the applicable date. *See* Exhibit 1, § 4(d).

e. In the event of any breach or threatened breach of the Debenture Agreements, JGB shall be entitled, in addition to all other available remedies, to an injunction restraining any such breach or threatened breach, without the necessity of showing economic loss and without any bond or other security being required. *See* Exhibit 1, § 8(g).

     f.   If any party commences an action or proceeding to enforce any provisions of the Debenture Agreements, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its attorneys' fees and other costs and expenses incurred in the investigation, preparation, and prosecution of such action or proceeding. *See* Exhibit 1, § 8(d).

24.    To date, JGB has delivered a total of 68 redemption notices to Defendant SLS pursuant to the Debenture Agreements.  Prior to Defendants' breach on April 2, 2018, the Company previously satisfied 66 of those notices, delivering to JGB a total of 655,177 (split-adjusted) shares of Company stock and a total of $800,000 in additional cash value, pursuant to the terms of the Debenture Agreements.

25.    Notwithstanding this history of prior redemptions, when Defendants decided to attempt to deprive JGB of the full value of its remaining redemption rights prior to their April 2, 2018 announcement of major company news, the Company changed course and refused to fulfill JGB's redemption rights under the Debenture Agreements.

26.    On April 2, 2018, JGB delivered Redemption Notice 67 for 309,521 shares of SLS stock pursuant to the Debenture Agreements.  On the same date, Defendants refused to deliver these shares, in violation of the Debenture Agreements, unless JGB agreed to SLS's unilateral and baseless effort to modify the formula for determining the number of shares to which JGB was and is entitled.

27.    SLS eventually delivered the 309,521 shares required by Redemption Notice 67, but not until 5 Trading Days later, on April 9, 2018, after JGB had been deprived of

the opportunity to sell shares into the market at the historically high prices and volumes that followed SLS's announcement of its clinical trial results.

28.     Even when delivering these shares and subsequent amounts, SLS has insisted that its new formula for share calculations should limit future redemptions by JGB. SLS has purported to reserve a right, notwithstanding its delivery of shares pursuant to the formula set forth in the Debenture Agreements, to claim that shares should have been requested and issued using SLS's baseless $10.50 Price Floor. In doing so, SLS has repudiated the clear terms of the Debenture Agreements.

29.     JGB has informed SLS that SLS's purported reservation of rights lacks merit and that JGB has acted and will act in reliance on SLS's redemption and delivery of shares in accordance with the Debenture Agreements, including by selling redeemed shares, which SLS has known is a fundamental aspect of JGB's investment strategy.

**B.     Defendants' Scheme to Deprive JGB of Its Debenture Rights**

30.     As noted above, Defendants also engaged in a coordinated scheme over several weeks to deprive JGB of its rights under the Debenture Agreements.

31.     First, on or about February 21, 2018, Defendant Krylov contacted JGB and offered to buy out JGB's remaining rights under the Debenture Agreements. On information and belief, Defendant Krylov made this offer at the direction and with the full knowledge of the Officer Defendants and the Director Defendants. Defendants did not inform JGB at this time that Defendants were in possession of material nonpublic information that would dramatically increase the Company's stock price and thus the value of JGB's remaining redemption rights.

The proposed terms provided insufficient reason for JGB to give up its existing value in the Debenture Agreements.

32.     On February 22, 2018 and again on March 4, 2018, Defendant Krylov made further offers to buy out JGB's rights under the Debenture Agreements, which JGB also did not accept, continuing to prefer to maintain its rights in the Debenture Agreements.  On information and belief, Defendant Krylov made these offers at the direction and with the full knowledge of the Officer Defendants and the Director Defendants.

33.     On March 4, 2018, Defendant Krylov advised JGB that Defendant SLS had drawn up terms of an additional offer to buy out JGB's rights under the Debenture Agreements.  In making this offer, Defendant Krylov asked JGB to halt its trading of SLS shares in the market in order to consider the terms of the offer, which in Defendants' view included material nonpublic information.  In connection with this discussion, Defendant SLS, through its then-CFO Defendant Krylov, also agreed that the Price Floor is $0.35 per share.  On information and belief, Defendant Krylov made this offer at the direction and with the full knowledge of the Officer Defendants and the Director Defendants.  JGB agreed to restrict its trading in order to receive the terms and consider the offer, and thus refrained from buying or selling SLS stock in the market during the period from March 7 to March 9, 2018 as it considered Defendants' offer, which JGB ultimately rejected.

34.     On March 22, 2018, Defendant Stergiou contacted JGB in order to propose yet another offer to buy out JGB's rights under the Debenture Agreements, with discussions continuing for several days thereafter as Defendants attempted to persuade JGB to forego its rights under the Debenture Agreements.  On information and belief, Defendant

Stergiou made this offer at the direction and with the full knowledge of the Officer Defendants and the Director Defendants.  JGB rejected these further offers as well.

35.     During the period of these discussions, JGB continued to deliver redemption notices to SLS as and when appropriate under the Debenture Agreements, which SLS continued to fulfill.

36.     On April 2, 2018, however, having been unable to offer JGB sufficient value to forego the rights it enjoyed in the Debenture Agreements – and, as would soon become clear, feeling that they were out of time to do so – Defendants contacted JGB and stated that the Company would no longer redeem JGB's demands for shares unless JGB would agree to a new method for calculating the number of deliverable shares.

37.     In a letter from Defendant Stergiou that day, Defendants insisted that the number of shares due under JGB's redemption notice should be calculated by dividing the Holder Redemption Amount by $10.50 and paying a portion of the Holder Redemption Amount in cash (as described in paragraph 23), instead of using the contractually determined Stock Payment Price of $3.23 as of that date.  This modification of the calculation methodology would yield approximately 30% of the number of shares to which JGB was entitled under the Debenture Agreements.  On information and belief, Defendant Stergiou delivered this message at the direction and with the full knowledge of the Officer Defendants and the Director Defendants. Defendants purported to base this modification on the fact that the Company, for its own reasons, had undertaken a 30-to-1 reverse stock split in December 2017, and Defendants believed that a corresponding 30-to-1 adjustment should be made to the Stock Payment Price Floor of $0.35 (as described in paragraph 23), which would adjust that price to $10.50.

38.     Defendants could cite no language in the Debenture Agreements, however, that would allow them to impose this transformation of the formula on JGB.  Nor could Defendants explain why the Company had recently honored JGB redemption requests even after the reverse stock split using $0.35 as the Stock Payment Price Floor.  Indeed, when JGB had discussed the calculation methodology with Defendants in the intervening months, Defendant Krylov expressly agreed that JGB was correct in continuing to regard $0.35 as the Stock Payment Price Floor.

39.     In fact, during the recent negotiations surrounding Defendants' unsuccessful effort to buy JGB out of its rights under the Debenture Agreements, Defendant Krylov sent JGB an analysis spreadsheet prepared by SLS, which reviewed several potential scenarios for future performance of SLS's stock and calculated the returns that JGB might expect to gain under each scenario if it chose to maintain its rights.  *See* Exhibit 5.  SLS's own analysis concluded, without comment or concern, that if JGB retained its interests under the Debenture Agreements, JGB could expect to redeem thousands of shares on a regular basis at prices well below $10.50.

40.     Defendants' April 2, 2018 letter ignored this history and refused to honor JGB's contractual rights unless JGB agreed to let Defendants deprive it of the vast majority of its remaining convertible interest in SLS stock.

41.     Just ten minutes or so after receiving the April 2, 2018 letter, JGB learned why Defendants were so intent on limiting JGB's access to additional shares by any means necessary.  At that moment, SLS issued a press release announcing positive results in its clinical trials for a breast cancer drug, Herceptin® +/- nelipepimut-S NeuVax™, which Defendants have

14

been developing for potential sale.  SLS's stock price, which had begun the day at $3.45 per

share, increased more than 100%, closing for the day at $8.65 per share.  The Company's stock

traded in the market at a volume of approximately 27 million shares over the next two days,

which was approximately 337 times its average volume.

42.     The press release on April 2, 2018 thus revealed why Defendants had

attempted since late February to get JGB to give up its rights to additional shares, and why

Defendants then unilaterally deprived JGB of those shares by breaching the Debenture

Agreements.  The announcement of the positive clinical results for the Company's key product

would, and in fact did, drive up the value of the Company's stock.  By contrast, Defendants

feared that issuing shares to JGB that JGB could then freely sell into the market would dilute

Defendants' interests and potentially put downward pressure on the Company's stock price.  But

the fact that Defendants' own interests in the Company's stock might be diluted by JGB's

redemption of its remaining interest does not change the fact that JGB paid for the right – and is

contractually entitled – to receive those shares.

43.     If Defendants had not refused on April 2, 2018 to deliver the shares to

which JGB was and is entitled under the Debenture Agreements, as JGB communicated to

Defendants, JGB would have promptly redeemed its entire remaining interest.  Thus, the total

remaining debenture amount of $8,021,702, which JGB had the right to redeem into 2,482,884

shares at a price of $3.2308 per share, would have been redeemed in time for JGB to sell shares

in the market at the new prevailing prices, when the VWAP for the two-day period of April 2-3,

2018 was $8.67.  If JGB had been allowed to redeem and sell the 2,483,500 shares to which it

was and is entitled as of those dates, JGB would have realized sale proceeds in excess of $21,531,945.00.[1]

44.     Instead, Defendants unilaterally and in bad faith deprived JGB of its contractual rights to delivery of shares under the Debenture Agreements. Defendants' refusal to honor the redemption notice on the morning of April 2, 2018 prevented JGB from redeeming its shares in a timely manner. JGB also did not have the opportunity to send SLS redemption notices for delivery of the additional remaining shares on or after April 2, 2018, because Defendant Stergiou informed JGB that SLS would not honor JGB's redemption demands according to the Debenture Agreements, and Defendants persisted in requiring JGB to agree to an extortive demand to restructure the share calculation methodology.

45.     Defendants have maintained that SLS may only redeem shares up to the limit they have attempted to impose on JGB unilaterally by insisting on a baseless modification to the formula set forth in the Debenture Agreements, depriving JGB of shares to which it is entitled, in addition to the value Defendants have already taken from JGB by failing to deliver the prior shares as and when requested under the Debenture Agreements.

46.     Thus, on and since April 2, 2018, Defendants have breached the Debenture Agreements by acting unilaterally and in bad faith to deprive JGB of SLS shares to which it was and is entitled, as well as the significant returns on those shares, for which JGB

---

[1] Under the Debenture Agreements, there is a "cap," which prohibits JGB from redeeming so many shares at any given time that JGB acquires as much or more than 4.9% of all outstanding shares of the Company's stock. As JGB informed Defendants, JGB could and would have redeemed and sold all of the 2,483,500 shares by redeeming shares in tranches of less than 4.9% of all outstanding shares and selling those shares into the market before acquiring more. Due to the extremely high volume of trading in the stock at that time, JGB would have been able to sell all 2,483,500 shares at or around the VWAP of $8.945 on April 2 and 3, 2018.

bargained when it invested in the Company through the Debenture Agreements. Defendants

took millions of dollars in much-needed funds from JGB under the Debenture Agreements in

2016 – funds which, among other things, allowed the Company to achieve the clinical results

that have driven its newfound growth in value. Defendants then schemed to deprive JGB of the

contractually guaranteed return on its investment through bad faith and violative conduct that

cannot be allowed to continue.

## FIRST CLAIM FOR RELIEF
## SPECIFIC PERFORMANCE
### (As Against Defendant SLS)

47.     JGB realleges and incorporates by reference the allegations in paragraphs

1 through 46, as set forth herein.

48.     Pursuant to the Debenture Agreements, including the August 2016

Agreement and May 2017 amendment, Defendant SLS is obligated to deliver redemption shares

in accordance with JGB's requests under the Debenture Agreements.

49.     Despite its clear and unambiguous contractual obligation to do so,

Defendant SLS has repudiated its contractual obligations and failed and/or refused to deliver the

shares due and owing to JGB pursuant to the Debenture Agreements.

50.     As a result of such failure and refusal by Defendant SLS, JGB has no

adequate remedy at law and, in the absence of specific performance, will suffer irreparable harm.

51.     Under Section 8(g) of the August 2016 Agreement, Defendant SLS

acknowledged that remedies available to JGB under the Debenture Agreements include "a decree

of specific performance and/or other injunctive relief," and that "a breach by Defendant SLS of

its obligations hereunder will cause irreparable harm to JGB and that the remedy at law for any such breach may be inadequate."

52.    JGB requests that the Court enter an order for specific performance directing and requiring Defendant SLS to continue delivering to JGB freely tradable shares of SLS common stock as and when JGB redeems such shares pursuant to the Debenture Agreements.

## SECOND CLAIM FOR RELIEF
### REPUDIATION / BREACH OF CONTRACT
### (As Against Defendant SLS)

53.    JGB realleges and incorporates by reference the allegations in paragraphs 1 through 52, as set forth herein.

54.    The Debenture Agreements are valid and enforceable contracts.

55.    JGB has performed all of its obligations under the Debenture Agreements entitling it to redeem its remaining debenture interest in the shares subject to Redemption Notice 67 and further redemption notices.

56.    Defendant Stergiou's letter to JGB stating that Defendant SLS will not honor JGB's redemption notices under the Debenture Agreements, and Defendant SLS's other conduct in failing and refusing to deliver the shares due and owing to JGB pursuant to the Debenture Agreements, constitute a repudiation and breach of the Debenture Agreements.

57.    JGB has suffered damages as a result of Defendant SLS's repudiation and breach of the Debenture Agreements.

18

58.     By reason of the foregoing, Defendant SLS is liable to JGB for direct and consequential damages, in an amount to be determined at trial.

59.     Moreover, JGB reserves the right to seek additional liquidated damages pursuant to Section 4(d) of the August 2016 Agreement, as discussed above in paragraph 23.

**THIRD CLAIM FOR RELIEF**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**(As Against Defendant SLS)**

60.     JGB realleges and incorporates by reference the allegations in paragraphs 1 through 59, as set forth herein.

61.     Defendant SLS entered into the Debenture Agreements with JGB and agreed to abide by the terms of those agreements.

62.     Those contractual obligations included implied covenants requiring Defendants to act in good faith and fair dealing.

63.     JGB has performed its obligations under the Debenture Agreements.

64.     Defendant SLS has deprived JGB of the agreed-upon consideration it bargained for pursuant to the Debenture Agreements, by refusing to honor JGB's redemption rights and by failing to deliver shares pursuant to the Debenture Agreements.  Defendants also engaged in a scheme to deprive JGB of its rights in the Debenture Agreements by seeking to induce JGB to give up their rights at misrepresented values.

65.     Defendant SLS's actions have breached the implied covenant of good faith and fair dealing and have caused, and continue to cause, JGB harm and damages.

## FOURTH CLAIM FOR RELIEF
## SECTION 10(b) OF THE EXCHANGE ACT AND
## RULE 10b-5 PROMULGATED THEREUNDER
### (As Against Defendants SLS, Stergiou, and Krylov)

66.     JGB realleges and incorporates by reference the allegations in paragraphs 1 through 65, as set forth herein.

67.     This count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

68.     Defendants Stergiou and Krylov issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, materially false and misleading statements to JGB, which were contained in several offers to buy out JGB's rights to delivery of shares and other rights under the Debenture Agreements, and in related discussions between Defendants and JGB.  Defendants' offers and related communications concealed, misrepresented, and failed to disclose, among other things, that the Company was about to announce positive clinical results that would lead to share values multiple times greater than the terms of Defendants' pretextual offers to JGB.  Defendants SLS, Stergiou, and Krylov made and maintained these misrepresentations directly to JGB in emails, telephone calls, and in-person conversations, beginning in the last week of February 2018 and continuing to the early morning of April 2, 2018.  Defendants SLS, Stergiou, and Krylov made and maintained these misrepresentations with the intent to defraud JGB into foregoing its share redemption rights at a price far lower than those rights were worth in light of the material nonpublic information regarding the positive clinical results, which Defendants alone possessed.

20

69.     Defendants Stergiou and Krylov were both officers of Defendant SLS at the time they made these materially false and misleading statements.

70.     As a direct and proximate result of Defendants' misrepresentations and omissions, JGB was prevented from trading in shares of SLS stock from March 7, 2018 to March 9, 2018. During this time period, Defendants induced JGB to be restricted from trading in order to consider Defendants' offers to buy out JGB's rights under the Debenture Agreements, while Defendants nonetheless withheld that the Company would soon be making a major announcement. This restriction prevented JGB from purchasing shares in the market at a comparably lower price and realizing the benefits when the share price of Defendant SLS's stock increased more than 100% on April 2, 2018.

71.     Defendants' actions as alleged herein violate, among other provisions, Section 10b of the Securities Exchange Act of 1934, as codified at 15 U.S.C. § 78j, and SEC rules promulgated thereunder, as codified at 17 C.F.R. § 240.10b-5.

72.     Defendants' actions also violate the terms of a cease-and-desist order that the SEC imposed on Galena, the predecessor to Defendant SLS, in April 2017. *See In re Galena Biopharma, Inc. & Mark J. Ahn*, Order Instituting Cease-And-Desist Proceedings, Release No. 10337, ¶¶ 7-9, 11-12, 19-20 (finding that, starting in 2012, Galena contracted with two companies to publish positive articles and messages about its stock, resulting in over 100 false or misleading publications designed to manipulate the value of Galena's securities, and that Galena failed to disclose options and stock paid to these companies), available at https://www.sec.gov/litigation/admin/2017/33-10337.pdf. The SEC ordered and Galena agreed that the Company would cease and desist from committing or causing any violations of federal

securities laws, including the statutory prohibitions of securities fraud pursuant to which JGB asserts this claim.

**FIFTH CLAIM FOR RELIEF**
**SECTION 20(a) OF THE EXCHANGE ACT**
**(As Against the Officer and Director Defendants)**

73.     JGB realleges and incorporates by reference the allegations in paragraphs 1 through 72, as set forth herein.

74.     At all relevant times herein, by virtue of their high-level positions, agency, and their ownership and contractual rights, as well as their participation in or awareness of the materially false and misleading statements disseminated to Plaintiff, the Officer Defendants and Director Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Defendants SLS, Stergiou, and Krylov, including the content and dissemination of the misleading statements, in connection with the particular transactions giving rise to the securities violations alleged herein.

75.     As set forth above, Defendants SLS, Stergiou, and Krylov violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Amended Complaint.

76.     By virtue of their position as controlling persons, the Officer Defendants and Director Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Officer Defendants' and Director Defendants' wrongful conduct, JGB suffered damages in connection with the restriction on trading Defendant SLS's securities, which Defendants' manipulative and deceptive buy-out offers necessitated.

77.    As a direct and proximate result of Defendants' misrepresentations and omissions, JGB was prevented from trading in shares of SLS stock from March 7, 2018 to March 9, 2018.  During this time period, Defendants induced JGB to be restricted from trading in order to consider Defendants' offers to buy out JGB's rights under the Debenture Agreements, while Defendants nonetheless withheld that the Company would soon be making a major announcement.  This restriction prevented JGB from purchasing shares in the market at a comparably lower price and realizing the benefits when the share price of Defendant SLS's stock increased more than 100% on April 2, 2018.

## SIXTH CLAIM FOR RELIEF
### FRAUD AND DECEIT
### (As Against Defendants SLS, Stergiou, and Krylov)

78.    JGB realleges and incorporates by reference the allegations in paragraphs 1 through 77, as set forth herein.

79.    Defendants made misrepresentations to JGB by concealing the forthcoming announcement of positive clinical results during the course of its offers to buy out JGB's rights under the Debenture Agreements, beginning in the last week of February 2018 and continuing to the early morning of April 2, 2018.

80.    Defendants' concealed the forthcoming announcement of positive clinical results, and otherwise took advantage of JGB's inferior knowledge of Defendants' products and business, during the course of its offers to buy out JGB's rights under the Debenture Agreements, beginning in February 2018 and continuing to the early morning of April 2, 2018.

81.    The forthcoming announcement of positive clinical results was material information, resulting in a large increase in the share price of SLS.  JGB owned and was entitled

to redeem further amounts of SLS's stock. Defendants' misrepresentations and concealment were intended to prevent JGB from realizing the value of existing shares and of any future shares received under the redemption.

82.     Defendants communicated their misrepresentations to JGB, beginning in February 2018 and continuing to the early morning of April 2, 2018. Defendants were aware of the falsity of their misleading statements and intended to convince JGB to sell its rights under the Debenture Agreement based on those misleading statements.

83.     As a direct and proximate result of Defendants' deceptive misrepresentations and/or concealment, JGB was prevented from trading in shares of SLS stock from March 7, 2018 to March 9, 2018. During this time period, Defendants induced JGB to be restricted from trading in order to consider Defendants' offers to buy out JGB's rights under the Debenture Agreements, while Defendants withheld that the Company would soon be making a major announcement. This restriction prevented JGB from purchasing shares at a comparably lower price and realizing the benefits when the share price of Defendant SLS's stock increased more than 100% on April 2, 2018.

### SEVENTH CLAIM FOR RELIEF
**CONVERSION**

**(As Against Defendant SLS)**

84.     JGB realleges and incorporates by reference the allegations in paragraphs 1 through 83, as set forth herein.

85.     Defendant SLS has unlawfully retained shares of SLS stock to which JGB was and is entitled, as Defendant SLS failed to deliver such shares to JGB as required under the Debenture Agreements.

86.     Notwithstanding JGB's demands that Defendant SLS deliver the required shares, Defendant SLS refused to deliver those shares, resulting in conversion.

87.     As a result of Defendant SLS's conversion, JGB has been damaged in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
**UNJUST ENRICHMENT**

**(As Against Defendant SLS)**

88.     JGB realleges and incorporates by reference the allegations in paragraphs 1 through 87, as set forth herein.

89.     Defendant SLS accepted and retained $24,000,000 in total funds from JGB in consideration for the Debenture Agreements, and $7,021,702.76 of that principal amount remains outstanding.

90.     At various times since April 2, 2018, Defendant SLS failed to deliver shares to which JGB was entitled under the Debenture Agreements.

91.     Defendant SLS knowingly benefitted by retaining the shares and equivalent value in violation of its duty to deliver shares under the Debenture Agreements.

92.     As a result of Defendant SLS's unjust enrichment, JGB has been harmed and damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff JGB respectfully requests that the Court enter judgment

in its favor as follows:

    A.    An order of specific performance directing and requiring Defendant SLS to continue delivering to JGB freely tradable shares of SLS common stock as and when JGB redeems such shares pursuant to the Debenture Agreements;

    B.    A declaratory judgment stating that the figure used to calculate the Stock Payment Price for delivery of shares in satisfaction of Holder Redemption Notices, as set forth in the Debenture Agreements, shall be and is the lower of the Prior Day VWAP and the Twenty Day VWAP, to the extent that the resulting Stock Payment Price would not be less than $0.35 per share;

    C.    An award of monetary damages against the Defendants, including direct and consequential damages (including, but not limited to, financing and related costs and expenses), jointly and severally, in an amount to be determined at trial;

    D.    In addition to monetary, direct, and consequential damages, an award of contractual liquidated damages pursuant to Section 4(d) of the August 2016 Agreement;

    E.    An award for JGB's costs and expenses incurred in prosecuting this action and in enforcing and/or collecting upon the Debenture Agreements, including without limitation reasonable attorneys' fees, costs and disbursements, pursuant to Section 8(d) of the August 2016 Agreement; and

    F.    Such other and further relief as the Court may deem just, proper, and in the interest of justice.

Dated: May 2, 2018
      New York, New York

                    LATHAM & WATKINS LLP


                    By:/s/ Christopher J. Clark
                        Christopher J. Clark
                        Douglas K. Yatter
                        Austin C. Murnane

885 Third Avenue
New York, New York 10022
Tel:  (212) 906-1200
Fax:  (212) 751-4864
Email: chris.clark@lw.com
        douglas.yatter@lw.com
        austin.murnane@lw.com

*Attorneys for Plaintiff JGB (Cayman)*
*Newton, Ltd.*