UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
JGB (CAYMAN) NEWTON, LTD.,           :
                      Plaintiff,     :    18cv3095(DLC)
                                     :
        -v-                          :    OPINION AND
                                     :    ORDER
SELLAS LIFE SCIENCES GROUP INC., DR. :
ANGELOS M. STERGIOU, MD, ScD H.C.,   :
ALEKSEY N. KRYLOV, JANE WASMAN,      :
STEPHEN F. GHIGLIERI, DR. DAVID A    :
SCHEINBERG, MD, PhD, ROBERT L. VAN   :
NOSTRAND, and JOHN VARIAN,           :
                      Defendants.    :
                                     :
------------------------------------ :
                                     :
SELLAS LIFE SCIENCES GROUP, INC.,    :
          Counterclaim Plaintiff,    :
                                     :
        -v-                          :
                                     :
JGB (CAYMAN) NEWTON, LTD., JGB       :
COLLATERAL, LLC, JGB CAPITAL OFFSHORE :
LTD., JGB PARTNERS L.P., and JGB     :
CAPITAL L.P.,                        :
          Counterclaim Defendants.   :
------------------------------------ X


APPEARANCES:

For the Plaintiff:
Douglas K. Yatter
Virginia Tent
Christopher J. Clark
Austin C. Murnane
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022

1

For the Defendants:
Jay B. Kasner
Christopher P. Malloy
Jeremy A. Berman
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

DENISE COTE, District Judge:

This litigation arises out of a convertible debenture agreement between JGB (Cayman) Newton, Ltd. ("JGB") and Sellas Life Sciences Group, Inc. ("Sellas").[1]  In 2016, JGB invested $24 million in Sellas's predecessor in exchange for such a convertible debenture.  Over the course of the parties' relationship, the debenture was amended from time-to-time.  One of the amendments placed a limit on JGB's right to convert principal into stock:  specifically, if the share price of Sellas's stock fell below $0.35/share as defined by the agreement, JGB would only be able redeem the number of shares it would have received had the price been $0.35/share, plus cash worth the difference between the amount redeemed and the actual value of the total delivered shares.[2]

---

[1] A convertible debenture is a debt financing instrument in which the holder of the debenture has the right to convert ("redeem") principal of the debt into stock of the borrower.

[2] For example, as explained in the parties' agreement and recited below, if JGB sought to redeem $100,000 at a time when the Stock Payment Price was $0.25/share, JGB would receive 285,715 shares of common stock (100,000 divided by $0.35) plus $28,571.43 in cash (the difference between the $100,000 sought to be redeemed

The parties' primary dispute centers around whether the agreements between the parties provide that the $0.35/share figure automatically adjusts for stock splits. The practical import of this disagreement is immense: according to JGB's calculations, adjusting the $0.35/share figure for stock splits would result in less than one third the number of shares than would issue if this figure remained unadjusted. Both sides argue that the transaction documents are unambiguous and have moved to have this matter decided on the pleadings and to dismiss the other side's claims. The motions are granted in part.

## BACKGROUND

The following facts are undisputed and contained in the Amended Complaint, the Amended Answer and Counterclaims, the exhibits thereto, and the documents integral to those pleadings.[3] Sellas is a clinical-stage biopharmaceutical company incorporated in Delaware with a principal place of business in New York. Sellas's predecessor company was Galena Biopharma,

---

and the value of the 285,715 shares calculated at the actual $0.25/share price).

[3] In connection with their briefing on the motions, both parties have submitted numerous additional documents not referenced in the pleadings or otherwise integral thereto. This Opinion does not consider these documents.

Inc. ("Galena"), which merged with Sellas in or around December 2017.  JGB is an investment fund with its principal place of business in the Cayman Islands.

The Securities Purchase Agreement

On May 10, 2016, JGB and Galena entered into a Securities Purchase Agreement ("SPA") whereby JGB paid $24 million to Galena, in return for a convertible debenture, which was issued the same day and titled 9% Original Issue Discount Senior Secured Debenture (the "Original Debenture").  The SPA functions as the primary agreement between the parties and contains numerous provisions applicable to other documents, defined in the SPA as "Transaction Documents."  The SPA defines "Transaction Documents" as follows:

> "Transaction Documents" means this Agreement [the SPA], the Debentures, the Warrants, the Security Agreement, the Subsidiary Guaranty, the Registration Rights Agreement, the Securities Account Control Agreement, Pay-Off Letter and all exhibits and schedules thereto and hereto and any other documents or agreements executed in connection with the transactions contemplated hereunder.[4]

(Emphasis supplied.)

The SPA contains general provisions regarding each of the Transaction Documents.  The SPA's merger clause provides that "The Transaction Documents . . . contain the entire

---

[4] The capitalized terms are each specifically defined in the definitions section of the SPA.

4

understanding of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements."[5]

Most importantly for this dispute, the SPA contains a Construction Clause applicable to all Transaction Documents that refers to stock splits.  It provides:

> The parties agree that each of them and/or their respective counsel have reviewed and had an opportunity to revised the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments thereto.  In addition, each and every reference to share prices and shares of Common Stock in any Transaction Document <u>shall be subject to adjustment for</u> reverse and forward <u>stock splits</u>, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of this Agreement.

(Emphasis supplied.)

The SPA also contains Galena's representation that it will not provide JGB with material non-public information.  Section 4.8 of the SPA provides that:

> Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company covenants and agrees that <u>neither it, nor any other Person acting on its behalf</u>, has provided prior to the date hereof or

---

[5] The SPA's choice of law clause provides that "[a]ll questions governing the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof."  The SPA also provides for disputes over each of the Transaction Documents to be litigated in the state and federal courts of the City of New York.

> will in the future <u>provide any Purchaser</u> or its agents
> or counsel <u>with</u> any information that the Company
> believes constitutes <u>material non-public information</u>,
> unless prior thereto such Purchaser shall have entered
> into a written agreement with the Company regarding
> the confidentiality and use of such information.  The
> Company understands and confirms that each Purchaser
> shall be relying on the foregoing covenant in
> effecting transactions in securities of the Company.

(Emphasis supplied.)

<u>The August 22, 2016 Debenture</u>

The Original Debenture was amended and restated on August 22, 2016, resulting in two documents:  the "Amendment Agreement," in which the parties agreed to amend and restate the Original Debenture, and the "Amended and Restated 9% Original Issue Discount Senior Secured Debenture Due November 10, 2018" ("Debenture"), which replaced the Original Debenture.  The Amendment Agreement provided that "this Agreement [the Amendment Agreement] and the [Amended and Restated] Debenture is a Transaction Document.  In addition, all references in the Transaction Documents to the Original Debenture shall be deemed to mean the Original Debenture as amended pursuant to this Agreement."  The Amendment Agreement also provided for Galena to publicly disclose the agreement on the next trading day, and that once the Amendment Agreement was disclosed, "[JGB] shall not be in possession of any material, nonpublic information received from [Galena]".

The Debenture is a complex, carefully worded instrument. The key provisions for this dispute are as follows. Beginning on November 10, 2016, JGB generally had the right to require Galena to redeem up to $1.5 million per month in principal on the Debenture. At Galena's option, the Debenture could be put into "Stock On" mode, at which point redemptions of the principal would be paid in shares of common stock of Galena, as long as certain conditions (the "Equity Conditions") were met. If the Equity Conditions were not met, then redemptions of principal were required to be paid in cash. At all relevant points here, the Debenture was in "Stock On" mode.

When paying JGB in stock, Galena was required to calculate the price of its stock as 92.5% of the Volume Weighted Adjusted Price ("VWAP")[6] for the trading day immediately prior to the redemption, or 92.5% of the average VWAP for the three lowest VWAPs in the 20 consecutive trading day period preceding the redemption notice, whichever was lower. In other words, the stock received by JGB under the Debenture would be valued at a significant discount relative to Galena's then-trading price. Galena was required to provide the requisite number of shares within three trading days after JGB delivered a notice of redemption. Failure to deliver the requisite shares within two

---

[6] VWAP is a means to calculate the average trading price over a particular day.

trading days after the due date was an "Event of Default" and would result in partial liquidated damages of $5 for each $1,000 of principal being redeemed for each trading day beyond the second trading day that delivery was delayed.

The key Equity Condition of relevance to this case requires that "the VWAP of the Common Stock is at least $0.20 per share (appropriately adjusted for any stock split, stock dividend, stock combination, stock buy-back or other similar transaction). . . ." (the "Price Floor").  If the Equity Conditions are not satisfied at the time of a redemption, JGB has the right to receive redemptions in cash, or, at its exclusive option, waive the failure of the condition and continue to accept stock.

The Debenture also contains two provisions aimed at ensuring that JGB would not be in possession of any material non-public information.  An Equity Condition is that "[JGB] is not in possession of any information provided by or on behalf of [Galena] that constitutes, or may constitute, material non-public information."  The Debenture also provides that:

> Each of [JGB] and [Galena] acknowledge [Galena's] obligation under [the SPA] to not provide any material non-public information to [JGB], and [JGB] agrees that [Galena] shall have no liability to [JGB] for failing to disclose any material non-public information in connection with the issuance of any Stock Payment Shares to [JGB] in accordance with the terms of this Debenture.

(Emphasis supplied.)

In November 2016, Galena underwent a 1-for-20 reverse stock split.[7]  Pursuant to the terms of the Debenture, the Price Floor was raised to $4.00.

## December 2016 Waiver

The parties next amended the Debenture on December 14, 2016, in a "Waiver" agreement ("December 2016 Waiver").  The December 2016 Waiver acknowledged that Galena's stock price had fallen below $4.00 per share (the new Price Floor), and indicated that Galena requested that JGB waive the Price Floor. The December 2016 Waiver waived the Price Floor for December 2016 through March 2017, subject to certain new conditions.  The December 2016 Waiver included a provision confirming that JGB had not been provided any material non-public information by Galena.  The December 2016 Waiver also included the following definitional provision:

> Transaction Documents.  The Debenture, the [SPA], . .
> . this Agreement, the other Transaction Documents, and
> all other agreements, instruments and other documents
> executed in connection with or relating thereto
> (collectively, the "Debenture Documents") are legal,
> valid, binding, and enforceable against [Galena] . . .
> in accordance with their terms.

---

[7] A reverse stock split is a type of transaction in which each outstanding share of the company is converted into a fraction of a share, thus making each individual full share proportionally more valuable.  The reverse stock split here converted each former share of Galena to 1/20 of a share, thus raising Galena's per share price by a factor of 20.

<u>May 2017 Amendment</u>

The next agreement in the record was entered into on May 1, 2017, in a document titled "Amendment Agreement" ("May 2017 Amendment").[8]  In response to a request from the NASDAQ Stock Market, the parties agreed that any price floor could not be lower than $0.35.  The May 2017 Amendment begins by stating that:

> WHEREAS, satisfaction of the Equity Conditions (as defined in the Debenture) requires among other things that the VWAP (as defined in the Debenture) for the Common Stock shall be at least $4.00 per share pursuant to paragraph (i) of the definition of "Equity Conditions" set forth in Section 1 the Debenture (the "Price Floor"); provided, however, that the Price Floor may be waived by the Holder at its option;
>
> WHEREAS, the NASDAQ Stock Market ("NASDAQ") has requested that the parties enter into agreement to provide that <u>any waiver of the Price Floor may not</u> result in the Stock Payment Price <u>being</u> <u>less than</u> <u>$0.35 per share</u>;
>
> WHEREAS, the Holder is willing to enter into the agreement requested by NASDAQ [on] the terms and conditions set forth herein.

(Emphasis supplied.)

The May 2017 Amendment contains a definitional section that is almost identical to that contained in the December 2016 Waiver that refers to itself as a Transaction Document and that

---

[8] JGB describes five occasions on which the Debenture was "amended and restated": August 22 and December 14, 2016, and May 1, July 10 and August 7, 2017.

also defines a category of documents as "Debenture Documents."

It reads:

> Transaction Documents.  The [Amended] Debenture, the
> [SPA], . . . the [December 2016 Waiver], the Waiver
> dated April 1, 2017, this Agreement, the other
> Transaction Documents and all other agreements,
> instruments and other documents executed in connection
> with or relating thereto (collectively, the "Debenture
> Documents") are legal, valid, binding and enforceable
> against the Company and Guarantors in accordance with
> their terms.

(Second emphasis supplied.)

The provision for a $0.35 price floor per share is

contained in the third paragraph.  It reads:

> 3. Agreement.  For purposes of Section 2(a) of the
> Debenture and Section 4(a) of the Debenture, [JGB] and
> [Galena] hereby agree that [JGB] may, from time to
> time, at [JGB's] option waive the Price Floor (for
> such number of Trading Days as [JGB] determines);
> provided, however, [JGB] cannot waive the Price Floor
> to the extent that the resulting Stock Payment Price
> would be less than $0.35 per share as a result of any
> such waiver.  For the avoidance of doubt, in the event
> of any Equity Conditions Failure that is not, or
> cannot be as a result of this Agreement, waived by
> [JGB], [Galena] shall honor the Holder Redemption
> Amounts in cash or, at [Galena's] election, with the
> prior written consent of [JGB], deliver aggregate
> consideration in shares of Common Stock and cash in
> satisfaction of the applicable Holder Redemption
> Amount as follows: (i) the number of shares of Common
> Stock equal to the quotient obtained by dividing such
> Holder Redemption Amount and $0.35 (each such share
> having a deemed value per share at the Stock Payment
> Price that would have been in effect but for the
> minimum Stock Payment Price condition of $0.35 per
> share set forth herein) and (ii) cash equal to the
> difference between the Holder Redemption Amount and
> the aggregate deemed value of the shares of Common
> Stock delivered in clause (i).  For example, if the
> applicable Holder Redemption Amount is $100,000 and

the Stock Payment Price would be $0.25 per share but for the provisions of this Agreement, then [Galena] shall issue 285,715 shares of common stock to the Holder and pay to [JGB] an amount in cash equal to $28,571.43.

4. <u>Limitation of Agreement</u>. <u>The Agreement set forth above shall be limited precisely as written</u> and relates solely to clause (i) of the definition of "Equity Conditions" set forth in Section 1 of the Debenture, Section 2(a) of the Debenture and Section 4(a) of the Debenture in the manner and to the extent described above . . . .

5. <u>No Modification</u>. Except as expressly set forth herein, nothing contained in this Agreement shall be deemed or construed to amend, supplement or modify the Debenture or any other Debenture Documents or otherwise affect the rights and obligations of any party thereto, all of which remain in full force and effect.

(Emphasis supplied.)

The point below which the Price Floor could not be waived by JGB under the May 2017 Amendment will be referred to as the Hard Price Floor. Like the other agreements, the May 2017 Amendment also selected New York law and a New York venue, and confirmed that JGB had not received any material nonpublic information.

<u>Collateral Account</u>

The SPA also provided that the Debenture would be secured by a restricted cash collateral account ("Collateral Account"). The parties agreed that the Collateral Account would contain a sum equal to at least the outstanding principal. Another agreement, the Securities Account Control Agreement, governed

12

this account.  The December 2016 Waiver amended the Securities Account Control Agreement to, among other things, provide that Galena "may not make withdrawals from the Account without the prior written consent of [JGB]."  The December 2016 Waiver also provided that JGB "shall, on a monthly basis, provided that no Event of Default has occurred and is continuing, provide written instructions . . . to wire transfer within three (3) Business Days after the end of the month any funds in excess of the outstanding Principal Amount of the Debenture" to Galena.

On July 10, 2017, JGB and Galena entered into an amendment of the Debenture in which the Stock Payment Price formula was modified to generally provide that the Stock Payment Price would now be 80% of the prior trading day's VWAP or 80% of the average of the three lowest VWAPs in the 20 prior trading days.  This increased the discount on Galena's shares when JGB redeemed principal.  Like the other agreements, it chose a New York venue and law, and confirmed that no material, nonpublic information had been provided to JGB.

August 2017 Merger

On August 7, 2017, JGB and Galena entered into a "Consent Agreement" ("August 2017 Consent") to permit Galena to merge into Sellas.  JGB gave permission to Galena to enter into the merger with Sellas, and further agreed to generally limit its redemptions to 15% of the daily trading volume of the stock.

Like the other agreements, it chose New York law, a New York venue, and, other than knowledge of the forthcoming merger, represented that JGB was not in possession of any material nonpublic information.

The merger between Galena and Sellas closed on or about December 29, 2017. Immediately before the merger, Galena effected a 1-for-30 reverse stock split. As outlined, the primary dispute between the parties is whether the Hard Price Floor remained at $0.35, or adjusted to $10.50 to account for the reverse stock split.

The parties' pleadings dispute various aspects of what happened next. For purposes of each motion, the non-movant's factual allegations are taken as true and all inferences are drawn in favor of the non-movant. Sellas's version is as follows. On December 29, 2017, JGB issued five Holder Redemption Notices to redeem $1.05 million in principal. Those redemption notices used the $0.35 cent Hard Price Floor. Sellas informed JGB that it would deliver the shares on a post-split basis, to which there was no objection. After the merger and reverse-stock split, on January 4, 2018, Sellas delivered the shares as calculated using the adjusted $10.50 Hard Price Floor. Throughout January and February, JGB accepted shares issued in response to Holder Redemption notices calculated using the $10.50 Hard Price Floor without complaint. In addition, JGB's

14

CFO sent an e-mail on February 1, 2018 indicating that JGB believed that the Hard Price Floor was $10.50.

The parties' pleadings also dispute what transpired during negotiations to retire the Debenture that took place in February and March 2018.  JGB's version is that on or about February 21, 2018, Sellas offered to buy out JGB's remaining rights under the Debenture.  Further offers to buy out JGB's rights under the Debenture were made on or about February 22 and March 4.

On March 4, Krylov advised JGB that it had drawn up terms of an additional offer, and asked JGB to halt its trading of Sellas's shares to consider the offer, which defendants believed contained material nonpublic information.  Sellas contends that this offer was tied to a Private Investment in Public Equity ("PIPE") transaction that it was in the midst of finalizing and which constituted material non-public information, such that JGB would have to stay out of the public markets once it was provided this information.  JGB agreed to receive the information, and halted trading from March 7 to March 9, 2018 to consider the offer, which it ultimately rejected.  Once the PIPE was publicly announced, on March 9, JGB was free to resume trading.

On March 8, in response to JGB's March 2, 2018 Holder Redemption Notice, which calculated the shares due using the $0.35 Hard Price Floor, Sellas began issuing shares to JGB using

15

the $0.35 Hard Price Floor.  Sellas claims that it believed it
could do so without waiving its rights under Section 4(d) of the
Debenture, which provides that "delivery [of shares] shall not
operate as a waiver by [Sellas] of any such action [Sellas] may
have against [JGB]."  JGB, for its part, contends that at some
point during the timeframe between December 2017 and April 2018,
Sellas agreed that $0.35 was the correct Hard Price Floor,
including specifically in a discussion on March 4, 2018.

On March 22, defendant Angelos Stergiou, Sellas's CEO, made
another offer to buy out JGB, which JGB also rejected.  Through
March 2018, the two sides could not come to an agreement on
retiring the Debenture.

On April 2, the dispute over the Hard Price Floor came to a
head.  That morning, Sellas took the position in a letter to JGB
that the Hard Price Floor was $10.50, and stated its intention
to refuse to honor any of JGB's Holder Redemption Requests
calculated using the $0.35 Hard Price Floor.  Later that
morning, JGB issued a Holder Redemption Notice calculated using
the $0.35 Hard Price Floor.  The same day, Sellas issued a press
release announcing positive results in clinical trials for its
cancer drug.  That was the first notice given to JGB of those
positive results.  Sellas's stock price more than doubled.

JGB claims that, as a result of Sellas's refusal to deliver
shares on April 2, 2018, it lost an opportunity to make $21.5

million selling Sellas shares. Sellas, for its part, claims that it delivered shares on April 5, 2018 using the $0.35 Price Floor within the three-day window provided by the Debenture.

Sellas further claims that on April 9, 2018, JGB denied Sellas's request to release $1.35 million from the Collateral Account, which it claims is the required collateral associated with redemptions issued in response to Holder Redemption Notices 62-67, which were issued sometime between March and April 2, 2018. Sellas claims that JGB and its agent JGB Collateral continue to refuse to release these funds.

## PROCEDURAL HISTORY

On April 9, 2018, JGB filed a complaint in this court, and amended that complaint on May 2 ("FAC"). The FAC asserts eight claims for relief: (1) a claim against Sellas seeking an order that Sellas specifically perform its obligations under the Debenture; (2) a claim against Sellas for breach of contract; (3) a claim against Sellas for breach of duty of good faith and fair dealing; (4) a claim for federal securities fraud against Sellas, Stergiou, and Krylov, for the conduct between February 2018 and April 2, 2018; (5) a control person claim against the officers and directors of Sellas; (6) a claim for fraud and deceit against Sellas, Stergiou, and Krylov; (7) a claim for

conversion against Sellas; and (8) a claim for unjust enrichment against Sellas.

On May 18, 2018, Sellas answered the FAC and brought counterclaims, and on May 25, amended its answer and counterclaims. The counterclaims are brought on behalf of Sellas only, and involve claims for: (1) declaratory judgment against JGB that the Hard Price Floor adjusted to $10.50 after the reverse stock split; (2) declaratory judgment against JGB and JGB Collateral requiring the JGB entities to deliver cash collateral owed to Sellas; (3) breach of contract against JGB for return of the excess shares it delivered while using the $0.35 Hard Price Floor; (4) breach of contract against JGB and JGB Collateral for release of funds held in the Collateral Account; (5) mutual mistake against JGB; (6) conversion against JGB and JGB Collateral; and (7) unjust enrichment against JGB Capital Offshore, JGB Partners, and JGB Collateral.

On June 18, Sellas moved for judgment on the pleadings; Krylov, Stergiou, and the Sellas officer defendants moved to dismiss the FAC; and all defendants moved to strike paragraphs 9 and 72 of the FAC. On July 6, JGB moved for partial judgment on the pleadings in its favor regarding its first and second causes of action, and to dismiss the counterclaims pursuant to Rule 12(b)(2) and 12(b)(6), Fed. R. Civ. P. Sellas's motion became

fully submitted on July 30 and JGB's motion became fully submitted on August 10.

On October 1, Sellas and the individual defendants moved for a temporary restraining order, a preliminary injunction, and expedited discovery.  On October 4, the parties filed a stipulation and proposed order, which the Court ordered the same day, rendering the motion for a temporary restraining order moot.  The parties subsequently agreed to consolidate the motion for a preliminary injunction with a trial on the merits, to take place in November.

## DISCUSSION

The standards governing motions to dismiss are well-established.  When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor."  LaFaro v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted).  The complaint will survive the motion to dismiss as long as it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  The court will deem the complaint "to include any written instrument attached

to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422 (2d Cir. 2011) (citation omitted).

Where a party moves to dismiss securities fraud allegations, "section 21D(b)(2) of the [Private Securities Litigation Reform Act (PSLRA)], which governs scienter pleading in securities fraud actions, establishes a more stringent rule for inferences involving scienter, and requires that a plaintiff's complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (citation omitted). An inference of scienter is "strong" and a complaint will survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).

"Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). "In deciding a Rule 12(c) motion, we apply the same

standard as that applicable to a motion under Rule 12(b)(6),
accepting the allegations contained in the complaint as true and
drawing all reasonable inferences in favor of the nonmoving
party." Mantena v. Johnson, 809 F.3d 721, 727–28 (2d Cir. 2015)
(citation omitted).  On a motion for judgment on the pleadings,
the court will consider documents attached to the pleadings, and
documents integral to them.  See L-7 Designs, Inc., 647 F.3d at
422.

## I.    The Contract Claims

The core of the dispute between these parties centers on
the interpretation of the Debenture and the May 2017 Amendment,
which created the Hard Price Floor.  With regard to the breach
of contract claims alleged in this dispute, JGB has moved for
partial judgment on the pleadings and to dismiss Sellas's
amended counterclaims, and Sellas has moved for judgment on the
pleadings to dismiss JGB's FAC.

Under New York law,[9] "a fundamental objective of contract
interpretation is to give effect to the expressed intention of
the parties."  In re MPM Silicones, 874 F.3d 787, 795 (2d Cir.
2017).  "The initial inquiry is whether the contractual

---

[9] Each of the relevant contracts provides for New York law to
govern disputes, and all parties in their briefing agree that
New York law governs.

language, without reference to sources outside the text of the contract, is ambiguous." Id.

> An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'

Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (quoting International Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)). By contrast, a contract is unambiguous if its "language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014). In determining whether a term is ambiguous, courts are to consider "the entire contract to safeguard against adopting an interpretation that would render any individual provision superfluous." RJE Corp. v. Northville Industries Corp., 329 F.3d 310, 314 (2d Cir. 2003) (citation omitted). "[T]he language of a contract is not made ambiguous simply because the parties urge different interpretations." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005)(citation omitted). "The matter of whether the contract is ambiguous is a question of law for the court." Law Debenture Trust Co. of New York, 595 F.3d at 465.

If an ambiguity exists, then a court may consider extrinsic evidence to determine its meaning.  See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).  Where extrinsic evidence is considered, the meaning of the ambiguous contract is a question of fact for the factfinder.  Id.  The sources of evidence that may be considered in interpreting an ambiguous contract include course of performance evidence.  Because such evidence involves factual disputes, however, it is generally inappropriate for resolution on a motion to dismiss or for judgment on the pleadings.

Both JGB and Sellas contend that the relevant contract terms are unambiguous and support their positions.  The plain meaning of the contract terms at issue here requires the Hard Price Floor to be adjusted for stock splits.

The Hard Price Floor was created by the May 2017 Amendment. The May 2017 Amendment provides that "the Holder cannot waive the Price Floor to the extent that the resulting Stock Payment Price would be less than $0.35."[10]  The Construction Clause of

---

[10] The Debenture provides for Sellas to issue securities to JGB that convert into publicly traded common stock at a percentage discount to the market price on the day of conversion.  Such securities are known as a "future priced," "death spiral," or "toxic" securities because of their potential to exert significant downward pressure on a company's stock price.  When shares are converted at a discount and then sold into the market at market price, the volume of common stock in the market increases, which drives the price per share down.  This, in turn, leads to an ever increasing amount of common stock being

the SPA directs that "each and every reference to share prices and shares of Common Stock in any Transaction Document shall be subject to adjustment for reverse and forward stock splits." By its unambiguous, plain terms, the Construction Clause applies to "Transaction Documents."

Transaction Documents are defined to include

> [the SPA], <u>the Debentures</u>, the Warrants, the Security Agreement, the Subsidiary Guaranty, the Registration Rights Agreement, the Securities Account Control Agreement, Pay-Off Letter and all exhibits and schedules thereto and hereto <u>and any other documents or agreements executed in connection with the transactions contemplated hereunder</u>.

(Emphasis supplied.) Because the May 2017 Amendment was a document executed "in connection with the transactions contemplated" by the SPA, the May 2017 Amendment is a Transaction Document. Read together, they require the reference to the Hard Price Floor to be adjusted for stock splits.

There is additional support in the parties' agreements for construing the May 2017 Amendment as a Transaction Document and requiring, as a result, the Hard Price Floor to be adjusted for stock splits. The May 2017 Amendment amends the Debenture. The parties have agreed that amendments to the Debenture are

---

issued and subsequently sold into the market upon conversions. Companies who issue future priced securities often negotiate a conversion price floor in order to control this downward spiral. <u>See</u> David A. Broadwin, <u>An Introduction to Antidilution Provisions</u> (Part 2), Prac. Law. 23, 28-29 (2004).

Transaction Documents, classified as "Debentures".  For instance, the first paragraph of the August 22, 2016 amended Debenture, defines "Debenture" as "this debenture, as amended, restated, supplemented or otherwise modified from time to time." In addition, a July 10, 2017 Amendment Agreement between the parties describes the Debenture "as amended and restated on August 22, 2016, and as subsequently amended on December 14, 2016, and May 1, 2017" (emphasis supplied), indicating again that the parties considered the May 2017 Amendment to be an amendment to the Debenture.

Finally, the May 2017 Amendment refers to itself as a Transaction Document.  It reads,

> Transaction Documents.  The Debenture, the Securities Purchase Agreement, the Subsidiary Guaranty, the Security Agreement, the Waiver dated December 14, 2016, the Waiver dated April 1, 2017, this Agreement, the other Transaction Documents and all other agreements, instruments and other documents executed in connection with or relating thereto (collectively the 'Debenture Documents') are legal, valid, binding and enforceable . . . .

(Emphasis supplied.)

JGB contends that this same clause's reference to a category of documents titled the "Debenture Documents," which includes the May 2017 Amendment, the Debenture, the SPA, and "other Transaction Documents," shows that "Transaction Documents" does not include the May 2017 Amendment, because the "Debenture Documents" category must be broader than the

25

Transaction Documents, or else it would be meaningless.  In the face of the many indications in the documents that the May 2017 Amendment is a Transaction Document, this argument is unavailing.  Read in context, the term Debenture Documents permits the parties to easily reference a broad and growing list of agreements in other sections of the same document.[11]

JGB next argues that because the May 2017 Amendment was not one of the transactions contemplated at the time of the execution of the SPA it cannot be a Transaction Document.  But, the SPA clearly contemplated future amendments, including by providing procedures for future amendment.  The "transactions contemplated" in the SPA logically include redemptions by JGB pursuant to the Debenture, and, while not created contemporaneously, the May 2017 Amendment is an agreement that is directly connected to the terms of these redemptions.

JGB next argues that, even if the May 2017 Amendment is a Transaction Document, the SPA's Construction Clause -- with its requirement that references to share prices be adjusted for stock splits -- does not govern the May 2017 Amendment because

---

[11] The term Debenture Document is used throughout the May 2017 Amendment to easily refer to the parties' existing contractual obligations.  For example, in the paragraph directly following its definition, the May 2017 Amendment states "Obligations.  The respective obligations of the Company and the Guarantors under the Debenture Documents are not subject to any setoff, deduction, claim, counterclaim or defenses of any kind or character whatsoever."

the clause does not include the word "amendments" and therefore only applies to a subset of Transaction Documents. JGB points out that while the Construction Clause expressly refers to "the Transaction Documents or any amendments thereto" when it provides that ambiguities are not to be resolved against the drafting party in interpreting these documents ("Drafter's Presumption"), the parties did not add the term "amendments" when they refer to Transaction Documents in the following sentence, which governs stock splits. The reference to amendments when discussing the Drafter's Presumption does not create an ambiguity about the need to adjust for stock splits whenever a Transaction Document refers to share prices. There is no tension between the two sentences, and each may be given its full force and affect without limiting the reach of either sentence.

The two sentences are the only two sentences in the SPA's section addressed to "Construction." They address entirely separate issues of construction. One addresses the Drafter's Presumption; the other addresses all references to share prices in light of stock splits. The first sentence uses the phrase "the Transaction Documents or any amendments thereto;" the second sentence begins with the phrase "In addition" and uses the phrase "any Transaction Document". As just described, the SPA's definition of Transaction Documents is inclusive and

encompasses documents not yet executed. It includes "any other documents or agreements executed in connection with the transactions contemplated hereunder." Also, as just described, the parties themselves referred to the May 2017 Amendment as a Transaction Document and to many other documents amending prior Transaction Documents as being Transaction Documents themselves.

In sum, JGB's suggestion that the SPA's direction -- that references to share prices "in any Transaction Document shall be subject to adjustment for reverse and forward stock splits" -- should not be read to actually apply to "any Transaction Document" would be at odds with the plain meaning of the sentence, as well as the SPA's definition of Transaction Documents. Throughout their documents the parties rely on the term Transaction Documents to encompass amendments to the original Transaction Documents, and to suggest that it does not would undermine the integrity of those documents in countless ways that have nothing to do with stock splits. The documents, read as whole, do not allow JGB's reading of the Construction Clause.

Finally, JGB places the most weight on a term of the May 2017 Amendment itself. In its fourth of eleven numbered paragraphs, the amendment describes the "Limitation of Agreement" ("Limitation Clause"). The Limitation Clause states that the amendment "shall be limited precisely as written and

relates solely" to three clauses of the Debenture. Those clauses concern the Price Floor, the accumulation of interest on principal, and mechanisms of redemption. The Limitation Clause articulates the standard legal requirement that unambiguous contracts be interpreted as written and directs attention to the provisions in the Debenture that the amendment is intended to affect. It does nothing to indicate that the terms of the May 2017 Amendment should not be subject to the Construction Clause of the SPA. Moreover, nothing in the May 2017 Amendment conflicts with the Construction Clause or indicates an intention by the parties to override the terms of the SPA. Indeed, its reference to the Price Floor provisions of the Debenture underscores the parties' intention that the Hard Price Floor created by the May 2017 Amendment directly impact the operations of the Price Floor, an intention which would of course be furthered if both price floors are simultaneously and automatically adjusted together for stock splits. JGB does not argue that the Price Floor provisions of the Debenture are not subject to the stock split adjustments required by the SPA's Construction Clause. Reading these documents together, then, and giving full force and effect to each of their terms, JGB's suggestion that the Limitation Clause brings the May 2017 Amendment outside the SPA and its Construction Clause must be rejected.

Accordingly, because the May 2017 Amendment refers to a share price of $0.35 and the Construction Clause requires share prices to be adjusted for stock splits, the only plausible reading of the contract is that an adjustment for stock splits must be made to the Hard Price Floor. If the language of the contract at issue in this dispute were ambiguous, an examination of extrinsic evidence would be warranted. Both parties argue that the course of dealings between the parties referenced in their pleadings and a NASDAQ rule and guidance support their interpretations of the contract. Because the terms in the parties' agreements that are relevant to this dispute are unambiguous, it is unnecessary to address the course of conduct allegations in the pleadings.[12]

Sellas also brings a contract claim related to JGB and JGB Collateral's obligation under the contract to release cash from the Collateral Account over which they exercise control. JGB and JGB Collateral seek dismissal of this claim on the grounds that Sellas's refusal to deliver shares to JGB in accordance with the parties' agreements constituted an "Event of Default" that destroyed any contractual obligation on the part

---

[12] Sellas also claims, as an alternative to its breach of contract claims, that mutual mistake occurred and asks the court to reform the May 2017 Amendment. Because Sellas's interpretation of the contract prevails, it is unnecessary to address this claim.

of JGB to consent to release of the cash collateral.  Because
Sellas's interpretation of the contract prevails, its April 2,
2018 letter stating that it would no longer accept the
unadjusted share price and its subsequent refusals to issue
redemptions using an unadjusted Hard Price Floor did not
constitute Events of Default.  Accordingly, JGB and JGB
Collateral's motion to dismiss Sellas's collateral account
breach of contract claim is denied.

## II.   Fraud Claims

The defendants seek to dismiss JGB's claim for fraudulent
omission under § 10(b) and for New York common law fraud for
failure to state a claim.  This motion will be granted.

To state a claim under § 10(b) of the Securities Exchange
Act, "a plaintiff must allege '(1) a material misrepresentation
or omission by the defendant; (2) scienter; (3) a connection
between the misrepresentation or omission and the purchase or
sale of a security; (4) reliance upon the misrepresentation or
omission; (5) economic loss; and (6) loss causation.'"  Charles
Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 92 (2d Cir.
2018) (citing Halliburton Co. v. Erica P. John Fund, Inc., 573
U.S. 258, 134 S. Ct. 2398, 2407 (2014)).  "[A]n omission is
actionable under the securities laws only when the corporation
is subject to a duty to disclose the omitted facts."  Stratte-
McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015)

(citation omitted).  "Such a duty may arise when there is a
corporate insider trading on confidential information, a statute
or regulation requiring disclosure, or a corporate statement
that would otherwise be inaccurate, incomplete, or misleading."
Id. (citation omitted).  To meet the scienter requirement under
the PSLRA, a plaintiff must "state with particularity facts
giving rise to a strong inference that the defendant acted with
the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A
plaintiff cannot meet this requirement by merely "set[ting] out
facts from which, if true, a reasonable person could infer that
the defendant acted with the required intent."  In re Advanced
Battery Techs., Inc., 781 F.3d 638, 644 (2d Cir. 2015) (citation
omitted).  Rather, "[t]he inference of scienter must be cogent
and at least as compelling as any opposing inference one could
draw from the facts alleged."  Id. (citation omitted).  "The
requisite scienter can be established by alleging facts to show
either (1) that defendants had the motive and opportunity to
commit fraud, or (2) strong circumstantial evidence of conscious
misbehavior or recklessness."  ECA, Local 134 IBEW Joint Pension
Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d
Cir. 2009) (citation omitted).

In order to have standing to bring a private cause of
action under § 10(b), the plaintiff must be an actual purchaser
or seller of a security.  "[P]otential purchasers of shares . .

. who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material" lack standing under § 10(b).  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975).  But, "plaintiffs who have contractual rights or duties to purchase or sell securities could also maintain an action under § 10(b)." Lawrence v. Cohn, 325 F.3d 141, 148 (2d Cir. 2003).  See also Mallis v. FDIC, 568 F.2d 824, 829 (2d Cir. 1977) (finding that pledgee of stock in loan contract had standing as a "purchaser" under § 10(b)).  "Although the burden on a securities plaintiff to plead loss causation is not a heavy one, the complaint still must give some indication of a plausible causal link between the loss and the alleged fraud."  Charles Schwab Corp., 883 F.3d at 93 (citation omitted).

To state a claim for New York common law fraud, a plaintiff must allege "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages."  Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 170 (2d Cir. 2015).

The defendants argue that JGB's claims under § 10(b) should be dismissed because they have failed to adequately plead an actionable omission, they do not have the purchaser or seller standing required by the statute, they have failed to adequately

33

plead scienter, and they have not adequately alleged loss causation.  For many of the same reasons, the defendants also seek to dismiss JGB's common law fraud claims.  The defendants additionally argue that the common law fraud claims are barred by New York's out-of-pocket loss rule.

JGB's allegations of fraud under both the Securities Exchange Act and New York common law must be dismissed because the FAC fails to plausibly allege that the allegedly fraudulent acts of Sellas caused JGB any losses.  In its fourth and sixth claims for relief, JGB alleges that the defendants fraudulently omitted information regarding the upcoming announcement of its clinical trial results in its statements to JGB surrounding offers to buy JGB out of the Debenture.  JGB contends that this prevented JGB from trading Sellas stock from March 7 to March 9, 2018, and buying Sellas stock during that period at a comparatively low price.  Accordingly, they did not realize benefits from this unpurchased stock when the stock price increased on April 2, 2018, once the clinical trial results were announced.  JGB does not explain in its FAC, however, how this two-day market restriction almost a month prior to the spike in stock value caused any particular loss.

Moreover, even if the two-day market restriction had caused losses for JGB, JGB cannot show that, had Sellas disclosed non-public information to it about its upcoming clinical trials

announcement, it could have entered the market and traded Sellas stock.  Had Sellas informed JGB in early March about the upcoming clinical trial announcement to occur in early April, which was non-public information, trading restrictions would have applied to JGB.  Thus, JGB has not adequately alleged a connection between the allegedly fraudulent omission of information about the clinical trial results and subsequent unrealized gains.

In its briefing, JGB puts forward a different theory of causation.  JGB argues that loss causation exists because the allegedly deceptive communications prevented JGB from trading or redeeming Sellas stock for several days, which in turn allowed Sellas to "maintain an artificially inflated stock price for itself and . . . fewer shares for JGB in its next redemptions." JGB argues that this furthered the defendants' broader goal of avoiding dilution of Sellas stock before and after its April 2 clinical trial announcement.  In other words, JGB argues that, acting in bad faith, Sellas used a disclosure of non-public information to JGB related to Sellas's attempt to buy out the Debenture to stall JGB's stock redemptions.  But even if JGB's FAC could be read to encompass this allegation, which it cannot, JGB still offers no explanation as to how two days of market restrictions in March could have caused JGB's alleged losses. JGB delivered 67 total redemption notices to the defendants

between August 2016, when the Original Debenture was first entered into, and April 2, 2018, the date of its 67th notice of redemption. While the FAC does not list the dates of each redemption notice, given that 67 were noticed in over one-and-a-half years, it is implausible, and most importantly not alleged, that JGB was noticing redemptions in March 2018 at such a rate that two days of exclusion would have altered its otherwise normal course of business.

Elsewhere in the FAC, JGB alleges that Sellas's delay of five trading days (between its alleged April 2, 2018 refusal to deliver shares requested in JGB's Redemption Notice 67 unless JGB acquiesced to Sellas's proposed calculation and its April 9 delivery of those shares at JGB's requested price, albeit with a purported reservation of rights) deprived JGB of the opportunity to trade Sellas stock at the record-high prices that followed its April 2 clinical trial announcement. This allegation is not repeated under JGB's two fraud causes of action. Even assuming that the FAC could be construed as alleging that this series of events constitutes a violation of § 10(b) and common-law fraud, again, JGB has failed to adequately allege loss causation. Although the five-day delay could plausibly have caused JGB to incur an unrealized gain, JGB does not articulate a connection between any misrepresentation or omission and this delay.

Rather, JGB attributes the delay to the defendants' repudiation and breach of the Debenture.

## III.  Control Person Claims

JGB also claims that the Sellas Officer and Director defendants violated § 20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a).  This section provides for derivative liability against individuals or entities that control individuals who violate the Securities Exchange Act.  See In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 238 n.6 (2d Cir. 2016).  To state a claim for relief under this section, a plaintiff must plead (1) a primary violation and (2) direct or indirect control of the primary violator by the defendant.  JGB's control person claims rely on the same allegations it stated in its fourth cause of action for securities fraud to establish the required primary violation.  Because JGB has failed to adequately state a securities fraud claim, JGB's fifth cause of action must also be dismissed.

## IV.  Implied Covenant of Good Faith and Fair Dealing

In the FAC JGB alleges that the defendants breached their duty of good faith and fair dealing by depriving JGB of its bargained-for benefits under the Debenture.  JGB alleges that Sellas deprived it of these rights through its refusal to honor JGB's redemptions per the terms of the Debenture.

"New York law implies [the] covenant [of good faith and fair dealing] in all contracts."  Sec. Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d 807, 817 (2d Cir. 2014).  "The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Moran v. Erk, 11 N.Y.3d 452, 456 (2008) (citation omitted).  For the implied covenant of good faith and fair dealing to apply,

> a party's action must directly violate an obligation
> that may be presumed to have been intended by the
> parties.  However, the implied covenant does not
> extend so far as to undermine a party's general right
> to act on its own interests in a way that may
> incidentally lessen the other party's anticipated
> fruits from the contract.

Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407-08 (2d Cir.), certified question accepted, 7 N.Y.3d 837 (2006), and certified question answered, 8 N.Y.3d 283 (2007) (citation omitted). "[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."  Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013).

JGB's allegations in its FAC that Sellas breached the duty of good faith and fair dealing by refusing to honor JGB's redemption rights arise from the same facts at issue in its

breach of contract claims and, as such, must be dismissed as redundant.  In briefing, JGB narrows its duty of good faith and fair dealing claim to exclude these duplicative allegations.[13] But its remaining, narrowed claim also fails.

The FAC asserts that the defendants' attempt to buy JGB out of its Debenture rights on fraudulent grounds -- to wit, their failure to disclose the clinical trial results -- constitutes a breach of the duty of good faith and fair dealing.  While this claim is distinct from JGB's breach of contract claim, it asserts little more than that the plaintiffs acted in their own interest in a way that incidentally may have diminished the value of JGB's contractual rights.  The parties' agreements continually state that JGB will not be in possession of material non-public information, and it was not a violation of either the Debenture or the duty of good faith and fair dealing to withhold such information from JGB.  Moreover, the FAC alleges only that the defendants sought to induce JGB to give up its rights but does not allege any actual loss based on this behavior.

---

[13] In its briefing, JGB argues that its claim for breach of the covenant of good faith and fair dealing is also based on the defendants' allegedly fraudulent scheme to manipulate its share price in February and March 2018 in order to maintain an artificially high stock price and reduce the number of shares JGB could redeem.  Such a scheme is not clearly alleged in the FAC and is certainly not mentioned under this claim for relief.

## V.    Unjust Enrichment

JGB alleges unjust enrichment against Sellas for benefiting from retaining shares and their equivalent value in violation of its duties under the Debenture.  Sellas also brings a counterclaim for unjust enrichment against JGB Capital Offshore, JGB Partners, and JGB Capital for receiving and selling shares of Sellas beyond that to which they were entitled.  The motions to dismiss the unjust enrichment claims are granted.

To state an unjust enrichment claim under New York law, the plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 516 (2012) (citation omitted).  For the defendant to be enriched at the plaintiff's expense, "[i]t is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery."  Kagan v. K-Tel Entm't, Inc., 568 N.Y.S.2d 756, 757 (1st Dep't 1991).  Unjust enrichment claims apply "only in unusual situations" such as "those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled."  Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790 (2012).  Recovery under a theory of unjust

enrichment ordinarily is unavailable where a valid contract governs the same subject matter. U.S. E. Telecomms., Inc. v. U.S. W. Commc'ns Servs., Inc., 38 F.3d 1289, 1296 (2d Cir. 1994). "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 586 (2d Cir. 2006) (citation omitted).

JGB's claim for unjust enrichment is rooted in the contract dispute between the parties. In its FAC, JGB alleges that since April 2, 2018, Sellas has "failed to deliver shares to which JGB was entitled under the Debenture Agreements" and that it "benefitted by retaining the shares and equivalent value in violation of its duty to deliver shares under the Debenture Agreements." Any windfall that JGB claims Sellas derived from its refusal or delay in delivering shares for the April 2, 2018 redemption would be remedied through its breach of contract claim and therefore cannot form the basis of an unjust enrichment claim.

In briefing, JGB characterizes its unjust enrichment claim as based on defendants' "scheme to cheat JGB out of its redemption rights," thus "propping up SLS's stock price to SLS's benefit." This formulation does not successfully distinguish the unjust enrichment claim from the breach of contract claim.

The most generous interpretation of JGB's unjust enrichment claim is as an allegation that Sellas's various actions between February and April 2018 caused JGB to receive fewer redemptions under the Debenture than it otherwise would have and that this, in turn, benefited Sellas at JGB's expense.  The only facts alleged in the FAC that go to the allegation that Sellas limited JGB's redemptions is the two-day market restriction that JGB agreed to as part of one of Sellas's offers to buy JGB out of the Debenture and the allegation that Sellas's April 2, 2018 notice that it would no longer issue shares based on the unadjusted Hard Price Floor prevented JGB from "hav[ing] the opportunity to send SLS redemption notices" for additional shares.  The market restriction cannot support a claim for unjust enrichment because, as discussed above, JGB fails to adequately connect this two-day restriction to any slow-down in JGB's redemption rates.  Moreover, JGB's FAC concedes that throughout the buyout discussions between the parties "JGB continued to deliver redemption notices to SLS as and when appropriate under the Debenture Agreements, which SLS continued to fulfill."  The allegation that Sellas's repudiation of the Hard Price Floor calculation prevented JGB from redeeming its shares is not plausible.  JGB's eighth claim for unjust enrichment must therefore be dismissed.

While Sellas's counterclaim for unjust enrichment also involves the same subject matter, it argues that it is not precluded by the contract dispute because the parties against whom the unjust enrichment counterclaim is alleged are not parties to any contract with Sellas.  This argument is unavailing.  The crux of the Sellas unjust enrichment counterclaim is that the counterclaim defendants were unjustly enriched because they received more shares of Sellas stock than JGB was entitled to under the Debenture.  Resolution of the contract dispute at issue in this case between Sellas and JGB will necessarily resolve the issue of whether the JGB affiliated counterclaim defendants unfairly benefitted.  For this reason Sellas's seventh counterclaim must also be dismissed for failure to state a claim.[14]

---

[14] JGB also alleges that the Court does not have personal jurisdiction over the JGB affiliated counterclaim defendants. "Where, as here, a district court ... relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction." Southern New England Telephone Co. v. Global NAPs Inc., 624 F.3d 123, 138 (2d Cir. 2010) (citation omitted).  "This showing may be made through the plaintiff's own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." Id. (citation omitted).  For the purposes of a motion to dismiss, Sellas has adequately alleged that this Court has personal jurisdiction over these JGB affiliated counterclaim defendants.  Regardless, the claim must be dismissed under Rule 12(b)(6).

## VI. Conversion

Both JGB and Sellas make conversion claims.  JGB alleges
that Sellas unlawfully retained shares of Sellas stock to which
JGB was entitled and refused JGB's demands for delivery of that
stock.  Sellas alleges that JGB and JGB Collateral have retained
approximately $1.55 million in cash that belongs to Sellas by
refusing to permit this cash to be released from the Collateral
Account.

To state a claim of conversion, a plaintiff must allege
that "a defendant exercise[d] unauthorized dominion over
personal property in interference with a plaintiff's legal title
or superior right of possession."  LoPresti v. Terwilliger, 126
F.3d 34, 41 (2d Cir. 1997) (citation omitted).  "[A] claim to
recover damages for conversion cannot be predicated on a mere
breach of contract."  Wolf v. Nat'l Council of Young Israel, 694
N.Y.S.2d 424, 425 (2d Dep't 1999).  While intangible property is
often not considered "personal property" for purposes of a
conversion claim, under New York law, shares of stock "merge
with the stock certificates, so that conversion of the
certificate may be treated as conversion of the shares that the
certificate represents."  Thyroff, 460 F.3d at 405.

JGB's conversion claim must be dismissed because it is
entirely predicated on the allegation that Sellas breached the
parties' contract by failing to issue JGB shares as required

under their agreement.  For the same reason, Sellas's conversion
claim must also be dismissed.  Sellas's conversion claim is
based on JGB and JGB Collateral's contractual obligation to
release cash from the Collateral Account as Sellas fulfills
JGB's redemption requests.  The allegations underlying this
claim are thus identical to Sellas's Collateral Account contract
claim.

**VII. Motion to Strike Paragraphs 9 and 72 of the FAC**

Sellas also moves to strike two paragraphs from JGB's FAC.
Both paragraphs refer to an administrative consent order between
the Securities and Exchange Commission ("SEC") and Sellas's
predecessor, Galena, and Galena's former CEO.  Under Fed. R.
Civ. P. 12(f), courts "may strike from a pleading an
insufficient defense or any redundant, immaterial, impertinent,
or scandalous matter."  Fed. R. Civ. P. 12.  Rule 12(f) motions
to strike are disfavored.  "The function of a 12(f) motion to
strike has been seen as avoiding the expenditure of time and
money that must arise from litigating spurious issues by
dispensing with those issues prior to trial."  VNB Realty, Inc.
v. Bank of Am. Corp., No. 11cv6805 (DLC), 2013 WL 5179197, at *2
(S.D.N.Y. Sept. 16, 2013) (citation omitted).  Motions to strike
under Rule 12(f) "should be denied unless the challenged
allegations have no possible relation or logical connection to
the subject matter of the controversy and may cause some form of

significant prejudice to one or more of the parties to the action." Id. at *3 (citation omitted).

The paragraphs at issue in the FAC are used by JGB to bolster its claim that Sellas has committed fraud under the Securities Exchange Act. JGB claims that Sellas's allegedly fraudulent acts also violate the terms of the consent order between Galena and the SEC, which required Galena to cease violating securities laws. Because JGB's fraud claims have already been dismissed, striking these paragraphs, which only support those claims, will not serve the underlying purpose of Rule 12(f). Regardless, Sellas cannot meet the high burden of showing that these paragraphs have no logical connection to the dispute. The paragraphs discuss past fraudulent securities practices of Sellas's predecessor company, a topic that is plausibly related to the controversy at hand. Sellas also makes no claim that these paragraphs cause it prejudice. The cease-and-desist order referenced in the paragraphs is available on the SEC's website. Because Sellas has not shown that the paragraphs cause it any prejudice and because striking them will not serve any efficiency purpose, Sellas's motion to strike paragraphs 9 and 72 from the FAC is denied.

## Conclusion

JGB's July 6, 2018 motion for partial judgment on its own claims is denied. JGB and all counterclaim defendants' motion to dismiss is denied as to Sellas's counterclaims one through four and granted as to Sellas's counterclaims five through seven for mutual mistake, conversion, and unjust enrichment.

Sellas's June 18, 2018 motion for judgment on the pleadings seeking dismissal of JGB's FAC and all other defendants' motion to dismiss the FAC are granted in full. Sellas and all other defendants' motion to strike paragraphs 9 and 72 from the FAC is denied.

This resolution of the pending motions leaves four counterclaims brought by Sellas for trial. They are (1) declaratory judgment against JGB that the Hard Price Floor adjusted to $10.50 after the reverse stock split; (2) declaratory judgment against JGB and JGB Collateral requiring the JGB entities to deliver cash collateral owed to Sellas; (3) breach of contract against JGB for return of the excess shares it delivered while using the $0.35 Hard Price Floor; and (4) breach of contract against JGB and JGB Collateral for release of funds held in the Collateral Account. In light of this Opinion's resolution of the core contract dispute, the parties

shall advise the Court by Thursday, October 25, 2018, whether a trial is necessary on the four outstanding claims.


Dated:     New York, New York
           October 23, 2018


_____
           DENISE COTE
United States District Judge